## HILZ v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

1. **Practice**: AVERMENTS OF PETITION : WAIVER : NEGLIGENCE. Where, on a trial of an action for the death of a person resulting from the negligent act of a railroad, both parties on the introduction of the evidence and by their instructions treat an issue as properly before the jury, the objection that such issue was not within the averments of the petition is waived.

2. —— : DEMURRER TO EVIDENCE. The defendant waives objection to the court's overruling an instruction in the nature of a demurrer to plaintiff's evidence by afterwards introducing evidence in its own behalf.

3. —— : ——. The entire evidence will be reviewed on a similar instruction asked at the close of defendant's evidence.

4. **Railroads Operating over Street Crossings**: DUTY AS TO LOOKING OUT FOR PERSONS : NEGLIGENCE. The law requires of persons operating railroads over public crossings in cities frequented by people affirmative and active watchfulness and charges them with the duty of keeping a proper lookout for persons using the highway.

5. —— : —— : ——. Where the failure of servants in charge of the engine to discover the peril of the deceased and to avoid the injury is due to their negligent omission to keep a proper lookout along the track in the direction in which the engine was moving, the company will be liable.

*Appeal from St. Louis City Circuit Court.* —HON. L. B. VALLIANT, Judge.

AFFIRMED.

*Thomas J. Portis* and *B. Pike* for appellant.

(1) Plaintiff's testimony did not make a *prima facie* case and the demurrer to the evidence should have been sustained. *Damrill v. Railroad*, 27 Mo. App. 202 ; *Powell v. Railroad*, 76 Mo. 80 ; *Railroad v. Hammet*, 32 Am. & Eng. R. R. Cases, 128 ; *Young v.*

Hilz v. The Mo. Pac. Ry. Co.

*Railroad*, 107 N. Y. 500 ; *Harlan v. Railroad*, 64 Mo. 480 ; s. c., 65 Mo. 22 ; *Flitch v. Railroad*, 64 Mo. 484 ; *Henz v. Railroad*, 71 Mo. 626 ; *Zimmerman v. Railroad*, 71 Mo. 476 ; *Lenix v. Railroad*, 76 Mo. 86 ; *Stepp v. Railroad*, 85 Mo. 229 ; *Purl v. Railroad*, 72 Mo. 168 ; *Hickson v. Railroad*, 80 Mo. 335 ; *Taylor v. Railroad*, 86 Mo. 457 ; *Bell v. Railroad*, 72 Mo. 80 ; *Moody v. Railroad*, 68 Mo. 470. (2) The court committed error in refusing to give the instructions asked by defendant. *Lenix v. Railroad*, 76 Mo. 86. (3) The instructions given by the court upon his own motion were erroneous. *Gurley v. Railroad*, 93 Mo. 450 ; *Rafferty v. Railroad*, 91 Mo. 37 ; *Ischer v. Bridge Co.*, 95 Mo. 261 ; *Harty v. Railroad*, 95 Mo. 368 ; *Dahlstrom v. Railroad*, 8 S. W. Rep. 777 ; *Edens v. Railroad*, 72 Mo. 212 ; *Waldheir v. Railroad*, 71 Mo. 514 ; *Buffington v. Railroad*, 64 Mo. 246 ; *Rine v. Railroad*, 88 Mo. 400 ; *Kendrick v. Railroad*, 81 Mo. 520 ; *Wood v. Railroad*, 58 Mo. 115 ; *Stephens v. Railroad*, 86 Mo. 227.

*D. P. Dyer* for respondent.

(1) The defendant is liable, notwithstanding the contributory negligence of the plaintiff's husband, provided that its engineer could have seen the danger in which plaintiff's husband had placed himself, and could thereupon have averted the injury. The refusal of the circuit court to nonsuit the plaintiff, and the submission of the cause to the jury under the instruction given was, therefore, proper. *Guenther v. Railroad*, 95 Mo. 286 ; *Dunkman v. Railroad*, 95 Mo. 232 ; *Sullivan v. Railroad*, 97 Mo. 113 ; *Bergman v. Railroad*, 88 Mo. 678 ; *Welsh v. Railroad*, 81 Mo. 466 ; *Frick v. Railroad*, 75 Mo. 595 ; *Harlan v. Railroad*, 65 Mo. 22. The evidence of plaintiff is sufficient to establish a case, but, if it were otherwise, that of defendant would also have to be considered. *McPherson v. Railroad*, 97 Mo. 253 ; *Bowen v. Railroad*, 95 Mo. 268 ; *Guenther v. Railroad*, 95 Mo.

286. (2) The allegations of the petition were suffi-
cient to sustain the submission of the cause to the jury
on this theory if timely objection thereto had been made.
*Sullivan v. Railroad,* 97 Mo. 113; *Neier v. Railroad,*
12 Mo. App. 35; *Otto v. Railroad,* 12 Mo. App. 168;
*Mack v. Railroad,* 77 Mo. 232; *Schneider v. Railroad,*
75 Mo. 295; *Ellet v. Railroad,* 76 Mo. 518; *Coudy v.
Railroad,* 85 Mo. 79. (3) The point of appellant, that
negligence at common law and negligence arising from
violation of ordinances cannot be pleaded in the same
count, is not well founded. *Otto v. Railroad,* 12 Mo.
App. 174. But the question does not arise in the case
at bar. Not having been raised in the trial court by
demurrer or motion of any kind, it is not presented by
the record. *Bank v. Dillon,* 75 Mo. 380; *Blair v.
Railroad,* 89 Mo. 383; *Hoyle v. Farquharson,* 80 Mo.
377; *Williamson v. Fisher,* 50 Mo. 198; *Baker v.
Raley,* 18 Mo. App. 562; *Brown v. Railroad,* 20 Mo.
App. 427. (4) The appellant cannot complain of the
theory upon which this cause was submitted to the
jury, since it tried the case on that theory and asked
for an instruction predicated thereon. *Bettes v. Magoon,*
85 Mo. 580; *Thorpe v. Railroad,* 89 Mo. 650; *Noble v.
Blount,* 77 Mo. 235; *Bank v. Hammerslough,* 72 Mo.
274; *Smith v. Culligan,* 74 Mo. 387; *Loomis v. Rail-
road,* 17 Mo. App. 340.

RAY, C. J.—Plaintiff brought this action in the
circuit court of the city of St. Louis to recover damages
for the death of her husband, Conrad Hilz, who was
run over and killed by an engine and tender of defend-
ant, at a certain crossing in said city, formerly called
Pratt avenue, but designated, we believe, at this time,
as Jefferson, or West Jefferson, avenue. She obtained
a verdict and judgment for five thousand dollars, from
which defendant has duly prosecuted this appeal.

A number of railroad tracks belonging to defendant
and other railroads run east and west over said public

crossing, which runs north and south.   This crossing is
depressed below the former grade of the street; and
could not be used by vehicles on that account, but was
used by pedestrians to a considerable extent, and, par-
ticularly, it would seem, at that time in the evening,
and especially by workmen employed at the oil com-
pany's works, which adjoined the railroad tracks
immediately on the south.   The husband of plaintiff,
who worked at said oil works, started north about six
o'clock in the evening on September 3, 1886, and passed
over three of said tracks, running, or hurrying, over
the third track, on which a train, belonging to the St.
Louis and San Francisco railroad, was then approaching
the crossing from the west, and then stood on the
fourth track from the south to let a train on the fifth
track, belonging to the Wabash railroad, pass.   Hilz
was watching this Wabash train approaching from the
west or northwest, and then very near the crossing, or,
as some of the witnesses say, was watching the San
Francisco train, and did not see the engine and tender,
which came from the east, and which ran over and
killed him.

It is not necessary to make any further statement,
for the present, of said Hilz's movements and conduct
on this occasion, as the trial court found that Hilz was
guilty of contributory negligence, and so directed the
jury.   The case was tried upon that theory, and his
contributory negligence was, and is, conceded in that
court and in this.   The petition, we may observe, con-
tains a general allegation that the death resulted from
the negligence and unskilfulness of defendant's agents
and servants whilst managing and running the loco-
motive, and further states and sets up several provisions
of the city ordinance alleged to have been violated, viz.:
The neglect of the watchman to display at said crossing
the signal required by the ordinance, running the engine
in excess of six miles an hour, failure to sound the bell,

and failure to have a man stationed on the tender to give danger signals.

The answer, besides the general denial, charges and sets up general contributory negligence on the part of the deceased husband. The testimony, we may observe, shows that the bell was ringing at the time, and there is no evidence to show that the watchman was delinquent and neglected to display his flag, as required by the ordinance. Section 26 of the ordinance set out in the petition, providing, in substance, that, if any cars or locomotive propelled by steam be moving within the city limits, a man shall be stationed on top of the car furthest from the engine, was, upon objection, excluded, and no evidence was offered in that behalf. In respect to the remaining provision of the ordinance set up and counted upon, requiring the rate of speed to be not in excess of six miles per hour, the evidence is conflicting, the plaintiff's witnesses, or some of them, putting it at ten miles an hour, whilst defendant's estimated it from four to six miles an hour. The only issue submitted to the jury was, substantially, whether or not the defendant's engine and tender were so far distant, or east, from said Hilz, when he stepped on the track, that the persons in charge thereof ought, in the exercise of ordinary care, to have discovered his peril, and have stopped in time to avoid injuring him.

The instruction given by the court of its own motion, being the only instruction given in the cause, so shows. It is perhaps desirable and best to set the same out in full, which we do as follows: "The court instructs the jury that a person who steps on a railroad track, over which engines and cars are accustomed to pass, is in duty bound to look up and down the track to see if any such cars or engines are approaching, and his failure to do so is negligence. In this case, the act of the deceased in stepping on defendant's track, on which the engine was backing, was a negligent act, and

precludes a recovery, unless the evidence satisfies you that he stepped on said track when said engine was so far distant from him that the person in charge of said engine ought, in the exercise of ordinary care, to have discovered him, and the peril he was in, and then have stopped, and thus avoided running over him. The question which the court submits to you is whether deceased stepped on the track when the engine was so far east of him that the persons in charge of the engine ought, in the exercise of ordinary care, to have discovered that he was in peril, and might then have stopped the engine in time to avoid injuring him. If you answer this question in the affirmative, find for plaintiff in the sum of five thousand dollars. If you find that he stepped on the track when the engine was so near to him that the persons in charge of the same, in the exercise of ordinary care, did not have opportunity to discover his peril, and stop before running over him, then find for the defendant.''

The point is made in this court for defendant that the petition does not authorize the submission of the issue so contained and submitted in said instruction. But, even if the objection would be sound and well taken in a proper case, the defendant, we apprehend, is in no position to urge the same in this court. Both parties, we think, tried the case upon the theory of this instruction. The defendant, it is true, excepted to the giving of this instruction, but, so far as the question involved is concerned, instruction numbered two, asked by defendant, is substantially the same.

Again, there was no exception or objection on either side to the evidence offered in this behalf, but while plaintiff sought to show, without objection by defendant, that Hilz was on the track, whilst the engine was far enough distant to have been stopped in time by the exercise of ordinary care, defendant sought by the cross-examination of plaintiff's witnesses to show to

the contrary, and also sought to so show by the witnesses introduced in its own behalf. The cause having been so tried, both parties, by the evidence and instructions having treated the issue as properly made, both parties having asked its determination and submission to the jury, the objection that there was no such issue, we think, cannot now be made. *Bettes v. Magoon,* 85 Mo. 580 ; *Thorpe v. Railroad,* 89 Mo. 650 ; *Loomis v. Railroad,* 17 Mo. App. 340.

II. As to the objection that the plaintiff's testimony did not make a *prima facie* case, and that therefore the demurrer to the evidence should have been sustained, it is sufficient to say, that defendant waived said objection by introducing its own evidence, and that the evidence in such cases will be considered as a whole in passing on objections of this character. Our recent decisions so hold. *Bowen v. Railroad,* 95 Mo. 268 ; *Guenther v. Railroad,* 95 Mo. 286 ; *McPherson v. Railroad,* 97 Mo. 253. The refusal, however, of a similar instruction asked at the close of the case and the exception taken in that behalf requires us to review the evidence taken as a whole, which we will now proceed to do.

As already stated, all the tracks, of which there were a number at said crossing, are sunk or depressed some two or four feet below the former grade of the street, so that vehicles and teams could not use the same and persons on foot descended to the plank road or way across the tracks for persons to cross on by means of three or four steps placed at the sides of the embankment. The accident happened at or a little after six o'clock p. m., and the watchman of defendant at that crossing testifies that more persons and engines pass over the crossing at this time of the day than at any other time. It seems to have been about the time for the arrival of a number of trains from the west, two at least were coming in at just that time, and the engine

and tender going west at that time had, it seems, drawn a train into the depot some five or ten minutes before and was then being taken back to the shops or place used for storage of engines. One of these trains, at least, as the evidence shows, was in the habit of stopping at the crossing at this time of day to let passengers get off and did so on this occasion, and was standing there on the next track north or was just in the act of starting up when Hilz was struck. The engineer did not see Hilz at all before running over him. He so testifies. He says that the first indication he had of a man being struck was when he felt the engine going over him. The fireman, and Michael Kelly, the road master, who was also on the engine at the time, make the same statements in this behalf. But, whilst these servants on the engine did not see Hilz at any time before he was struck or run over, other parties from their various positions observed him both before he stepped onto the track and while he was standing there. Several of these parties " hallooed " to Hilz and waved their hands endeavoring to attract his attention.

The witness Ham, or Horn as defendant's abstract has the name, who was, at the time, some fifty or seventy-five feet distant and walking on the south side of the second track from the south, saw Hilz as he came to the track and as he stopped and stood thereon, but did not see him, it seems, at the moment he was struck owing to the San Francisco train coming in the way. He saw the engine coming from the east before he noticed Hilz, and the same passed him a little east of the crossing.

The witness, Redman, a postal clerk on the San Francisco train, then arriving, who stood at the door in the forward part of the mail car, looking out on the north side, saw Hilz cross the track on which his train was then moving, less than three hundred feet to the west and step upon the next track north and stand

there a few seconds until struck, being then as he estimates about one hundred feet from Hilz.

Bowen, the defendant's watchman, also witnessed the accident. He was standing, at the time, he says, near his shanty, located on the south side of these tracks. Hilz, when he first saw him, was "standing between the east-bound and west-bound tracks of the Missouri Pacific railway," that is, as we understand it, between the third and fourth tracks. He saw Hilz step upon the track and the danger he was in and he and two other persons near him hallooed "look out, look out there."

Ziegler, a private watchman of the Wabash railway, was at the time coming out of the said shanty of the defendant's watchman, just mentioned. He first noticed Hilz when he was between the second and third track, and shouted at him before he crossed the track on which the San Francisco train was coming in. The witness testifies that he "made a break to pull Hilz away but the 'Frisco was getting so close he could not make it."

So far, then, the facts are not disputed, that Hilz did not look to the east and did not see or know of the approach of the engine; but was occupied the whole time watching one or the other of these two approaching trains from the west; that the engineer and other servants on the engine did not see Hilz at any time before he was struck, and that the witnesses mentioned, from their said respective positions did see the said Hilz and his dangerous situation and tried to warn him of his peril. As the servants upon the engine did not see Hilz at all, either when near or upon the track, there was no effort made to stop or check the engine prior to the injury. This, also, is undisputed. But there is considerable variety and conflict in the evidence as to the distance of the engine from the crossing and Hilz at the time the latter approached and stepped upon and stood on

the railroad track. The distance is variously estimated from óne hundred to one hundred and fifty or two hundred feet down to twenty or twenty-five feet. For example, Redman, the postal clerk, testifies that when Hilz stepped on the track the engine was one hundred to one hundred and fifty feet east of him. Ham, who was to the east of the crossing and between Hilz on the west and the engine on the east, and who was, we believe, walking west and about fifty or seventy-five feet distant from Hilz, says in one place that when he last saw Hilz the engine was about seventy-five feet from the deceased, and again he says he saw Hilz standing on the south rail of the fourth Missouri Pacific track when the engine that struck him was about fifty feet away from him.

Bowen testifies that when he first saw Hilz standing between the tracks the engine, he supposed, must have been one hundred feet from him, and that when he stepped on the track the engine was twenty-five or thirty feet from him.

The witness, Ziegler, testifies that when he first noticed Hilz he was between the second and third tracks, and that the engine, when he first noticed it, was about one hundred and fifty feet east of Hilz, and he first says that when Hilz stepped upon the track the engine was about one hundred or one hundred and twenty-five feet from him, but afterwards says the distance was twenty-five or thirty feet.

Benj. Nelson testifies he was one hundred and fifty feet east of the crossing going west and walking between the third and fourth tracks, and that when he first saw Hilz he was "crossing in front of the San Francisco train on the run;" that the engine at the time he saw Hilz, he thinks or judges, was not more than fifty or seventy-five feet from the crossing. These are all the witnesses testifying in this matter of the distance of the engine from Hilz and the above is, we think, a fair summary of what they say on this point.

Perhaps this is an appropriate place, in our review and summary of the evidence, to notice the claim urged by counsel for defendant, that there is no testimony in the cause to show within what space the engine could have been stopped, after Hilz got on the track, or after he could have been seen by the engineer in the exercise of reasonable care. The engineer testifies that he could have stopped if he had seen danger within forty or fifty feet, at the rate of speed he was then running, which he estimates at about five or six miles an hour. He also states that after running over Hilz he stopped on that occasion in forty or fifty feet. The fireman of the engine in question testifies that they stopped the engine " in twenty or twenty-five feet after he felt the engine going over the man."

But to proceed. Having sufficiently stated what the evidence shows to have been Hilz's conduct on this occasion, which was manifestly negligent, inasmuch as he seemed to have been watching one or the other of these trains on the other tracks, without looking, at least, to the east, along the track on which he was standing, when, as the evidence shows, he might have taken a safe position between the tracks and having seen that the engineer did not see him at any time, let us, in order for a complete view of the case, examine, as briefly as we can with fairness, what the evidence shows or tends to show the engineer and servants in control of the engine were doing at and just prior to the time of the injury, and their opportunities, if any, to discover the dangerous situation of Hilz, and ability thereafter to avoid running over him.

In behalf of plaintiff, E. C. Redman testifies that he had been postal clerk on railroads for five years, and was familiar with said crossing. He was, as before said, at the forward door on the north side of the mail car, and estimates that his train, moving on the track next to and south of the one Hilz was on, was about one

hundred feet from Hilz when he stepped to the middle of the next track to the north. He then continues his testimony in part as follows: "He (meaning Hilz) was facing northwest, more north than west. When he stepped on the track (the outgoing track of the Missouri Pacific) this engine was one hundred to one hundred and fifty feet east of him. There was nothing in the way to prevent the engineer or fireman, or any one else who was on the lookout, from seeing this man. The track is a little bit curved, but not enough to prevent any one from seeing up and down the same. I was standing with my body half out of the door holding on to a hand rail, watching the trains, and I noticed the man standing there, and I saw the danger of the engine backing up, and I hollered and waved my hand, trying to get him to see me. He was noticing the Wabash train, I think, and did not see me at all, and he stood on the outgoing Missouri Pacific track, standing about the center of the track, standing still, and it was not then but in the course of a few seconds until he was struck and run over. When it struck him the engine was backing very rapid and it knocked him forward. I did not see either the engineer or fireman until after the engine had struck Hilz, and then I only saw the engineer sitting on his seat as the engine passed, so that he did not seem to even then know that he had struck anything. He did not notice it. I was pointing, hollering and pointing down to the man, and people on the Wabash were pointing down too. Some passengers on the Wabash were pointing at the man, and as he passed over something directed his attention. I do not know whether it was myself or some others. The engineer's head was not out of the cab window. He was on the south side of the engine. I was on the north side of my train, and he on the south side of his engine. It was an ordinary engine, only it was a large engine, a road engine, with the usual tender. There was no one on the

end or on top of the tender. They were going ten miles an hour, or about that rate of speed. * * * The Missouri Pacific did not slow up a particle before it struck Hilz. The engineer was still working steam when he passed us."

John Fox, another postal clerk in the same car, but at the rear door, says the engine was running "quite rapidly, at about ten miles an hour," but otherwise his testimony is, we think, not material.

James S. Leahy, the engineer, testifies, so far as we need now notice, that he was running and in charge of the engine at the time that it struck Conrad Hilz, husband of plaintiff; that the accident happened near the foot crossing of West Jefferson avenue; that he had gone into the Union Depot with passenger train number 2 at six o'clock p. m. on the day of the accident, and immediately detached his engine and tender, and was backing up west with them at the time of the accident (which happened at about a quarter past six o'clock) in order to put them in the shops, which are situated about three blocks west of said Jefferson avenue crossing; that he did not see the accident; that at the time of and prior to the accident he was standing upon the footboard of the engine in the cab looking west all the time after he was backing up west from the Union Depot; that the engine was going west with the tender in front, and that he could see any one on the track in front of the tender if such person was within twenty or twenty-five feet of the tender; that he was looking at the track as he was backing west all the time after he left the Union Depot and didn't see any one on the track; did not see the deceased on the track, and that the first indication he had of this man's being struck was when he felt the engine going over him; that the engine at the time of the accident was going about six miles an hour.

He further testifies on cross-examination, so far as material, that he saw the two trains, that is, the Wabash

and San Francisco trains, but was not watching them particularly; that he was looking right up the track he was going on and did not see Hilz on the track or by the side of the track; that if Hilz stepped on his track, when the engine was within ten or twelve feet of him, witness did not see him step there; that they have backboards on the engines that would be behind the engineer when the engine was running backwards; that Hilz may have come across the space between the tracks when the engine was at a greater distance from him than ten or twelve feet, and that he, on account of the obstruction of the "backboard" might not have seen him; that he does not believe that Hilz crossed the track the San Francisco train was on when the train was one hundred and fifty feet away from him; that if he had done so witness would have seen him; that witness thinks that Hilz must have crossed the track upon which the San Francisco train was about fifty feet in front thereof, because at that distance witness might not have been able to see him, on account of the "backboard," just mentioned; that witness was not watching the Wabash train to see if passengers were getting off of that train; that he did say before the coroner at the inquest that "he was watching the Wabash train, as it frequently happened that people jump off the train, and sometimes get hurt;" that he was looking at the train and at his track, that at the time of making the above answer before the coroner he was not thinking of the Wabash, but had the San Francisco train in mind, as people get off of that train sometimes in front of an engine when the same train is going fifteen or twenty miles an hour; that his engine was going north to exceed six miles an hour at the time of the accident; that if he had known of the danger he could have stopped the engine within forty-five or fifty feet; that he went forty or fifty feet after running over Hilz; that as soon as he felt something under the engine he

reversed it; that without putting his head out of the window he could see a man on the track ahead of him twenty-five or thirty feet from the tender; that he did not have his head out of the window at the time of the accident but was standing on the footboard looking over the tender; that the first he saw of Hilz was after he stopped; that the accident happened at or nearly at the crossing; that if he had seen Hilz a hundred or one hundred and fifty feet west of his engine on the track he would have avoided running over him by stopping his engine, and that Hilz must have got on the track in front of the backing engine after the tender and backboard obstructed his vision.

H. C. Wheat, the fireman on said engine, testifies that the engine was going at a speed from four to six miles an hour; that he had his head out of the window on his side of the engine ringing the bell; that he didn't see the accident; that he was in his proper place on the engine, looking west, but saw no man on the track in front of them; that he knew nothing of the accident till he felt the engine going over the deceased; that the engine then stopped within twenty or twenty-five feet.

On cross-examination, witness said that he was looking to the west, and could see the track for six or seven hundred yards before he got to the crossing, and could see all the tracks, but saw no one walking on the Missouri Pacific north and south tracks; that the tender in front of the backing engine upon which he was would get within forty feet of the crossing before the sight of a man standing on the crossing would be cut off; that if a man was on the north side of the track the tender would not hide him from view; that he knows no more as to how Hilz got on the track than the counsel for plaintiff did.

James Bowen, the watchman at the crossing, among other things states: That when the deceased was standing between the two tracks the Missouri Pacific engine

was at least one hundred feet away; that, when he stepped upon the track in front of the Missouri Pacific engine, the engine was not more than twenty-five or thirty feet from him; that he thinks that there was nothing in the way to prevent Hilz from seeing the engine or the engineer from seeing Hilz when Hilz was standing between the tracks and the engine was one hundred feet away; that when Hilz went onto the track the engine was twenty-five or thirty feet away and Hilz stopped there; never turned the position of his head which was turned towards the San Francisco train.

Mr. Ziegler says, as previously stated, that when he first saw Hilz he was between the second and third tracks, and that the engine when he first noticed it was about one hundred and fifty feet east of Hilz. As before seen, his statements are not harmonious as to the distance of the engine when Hilz stepped on the track, as he answers the first inquiry in that behalf saying that he judges the distance about one hundred or one hundred and twenty-five feet, but in reply to the very next question says it was twenty-five or thirty feet. On cross-examination, he says the deceased stopped a minute or a little more between the third and fourth tracks, that is the one on which the San Francisco train was going east and the one on which the engine was going west, and that at this time the engine was one hundred or one hundred and fifty feet from him; that there was nothing to prevent him, while he was standing between the tracks, from seeing the Missouri Pacific engine, and nothing to prevent the engineer on said engine from seeing deceased if he had put his head out of the window and looked.

Charles Fuchs states that he did not notice any one at the crossing when Hilz was hurt; that a man standing where Hilz was hurt, looking down the Missouri Pacific track, could have seen the engine one

hundred and fifty yards away, and that he supposes that the engineer could have seen a man standing there.

Benjamin Nelson, who locates himself about one hundred and fifty feet east of the crossing, and who was between the third and fourth "or in-bound and out-bound tracks" of defendant, testifies: That when he first saw Hilz he was crossing in front of the San Francisco train "on the run;" that witness could not tell how far the engine was from Hilz then, as the engine was between him and the San Francisco train; that the Missouri Pacific engine had passed witness, the witness going west and the engine in the same direction; that the engine, at the time he saw Hilz (he thinks), was not more than fifty or seventy-five feet from the crossing; that he saw Hilz run to get out of the way of the San Francisco train and step up onto the west-bound track.

Michael Kelly, the road master, testifies that he was on the engine at the time, standing on the gang-way, between the engineer and fireman; that he was looking west all the time they were going and would have seen any one on the track unless he was pretty near to the engine; that he could not see a man on the track plainly at a less distance than two hundred and fifty feet, but the engineer could see one at about one hundred feet; that if a man had been standing on the track one hundred feet ahead of the engine or that distance on the south side of the track, there was nothing to prevent the engineer from seeing him if he had looked. This witness, as well as the engineer, says the engine was running five or six miles an hour, that being the usual rate at that hour, as he says, on account of the number of people.

The above summary, which is somewhat extended and perhaps tedious, gives the substance of the evidence as we gather the same from abstracts furnished us and the record in the cause. Taken as a whole, it

makes, we think, a case of conflicting evidence for the jury. The case, we apprehend, is different in essential features from, for example, the case of *Barker v. Railroad*, 98 Mo. 50, and other cases of that type. In that case, the deceased was a trespasser making a footpath of the railroad track, and the facts and circumstances are such that we held that the company owed the deceased no duty to be on the watch for him, and was only bound not to wantonly, wilfully or with gross negligence injure him. Here the evidence, reasonably construed, shows that the deceased was run over at a public crossing in the city ; that at least one train, usually arriving at that hour, stopped at this crossing to let passengers off ; that the increase of persons, largely workmen at the oil works, adjacent to the tracks, using said crossing at that hour, was such that the engines were expected to, and usually did, run at reduced speed on that account. These facts being before us, we may remark that, with respect to such localities in cities, the law manifestly requires affirmative and active watchfulness on the part of those operating steam engines, and charges them with the duty of keeping a proper lookout for persons using the highway.

Parties operating such engines must do so, we apprehend, upon the theory that collisions and accidents are liable to happen at public crossings in general use in cities like St. Louis. And they ought to be vigilant and ready to avoid impending dangers, if they can reasonably do so. This increased care the law exacts out of tenderness for human life, which is more largely or frequently exposed at such places than at other localities. If, then, the law charges those in control of such dangerous agencies with the duty of active vigilance, at such places, then the fact that they did not see the person injured will not, in such cases, necessarily exonerate the corporation from liability.

If such failure to so discover him was the result of the omission of that measure of duty, which the law requires, in view of the locality, circumstances and dangers to be anticipated, and the due observance thereof would have enabled the persons in control of dangerous agencies of this sort to have avoided the injury by the use of reasonable care, then and in such case, such omission and want of reasonable care is, under the law, held the proximate cause of the injury, and liability for the resulting damage may then exist, notwithstanding the negligence of the person injured. *Bell v. Railroad,* 86 Mo. 599, and cases cited; *Frick v. Railroad,* 75 Mo. 595; *Harlan v. Railroad,* 65 Mo. 22; *Guenther v. Railroad,* 95 Mo. 286; *Dunkman v. Railroad,* 95 Mo. 232; *Sullivan v. Railroad,* 97 Mo. 113; *Bergman v. Railroad,* 88 Mo. 678; *Welsh v. Railroad,* 81 Mo. 466.

With these principles in view, it may, we think, be fairly claimed and contended upon the evidence before us, that the failure of the servants and employes on the engine to discover the deceased and to avoid the injury was due to their negligent omission to keep a proper lookout along the track in the direction in which they were moving at the time. The fact that several others, some of whom were not charged with any duty to the deceased, saw him and attempted to warn him, makes it seem somewhat remarkable that none of these servants on the engines, who were under obligation to watch the public crossings for just such occurrences, did not observe him at any time before the collision occurred. This feature in the evidence, together with what the engineer said he testified to before the coroner, makes it seem probable that the engineer's attention also, as well as that of the deceased, was drawn off at the critical moment by one or both of said trains, which he was meeting and about to pass at the time. But, whether this be so or not, the testimony of Redman, the postal clerk,

and the main witness for plaintiff, if believed by the jury, would justify the finding of the issue submitted to them by the court, in plaintiff's favor.

We have already set out the material portions of his evidence, but will again quote a few statements therefrom at this time to show again its bearing in some important respects. He says: "There was nothing in the way to prevent the engineer or fireman or any one else who was on the lookout from seeing this man. The track is a little bit curved, but not enough to prevent any one from seeing up and down the same." Again he says that, when "Hilz stepped on the track, the engine was one hundred to one hundred and fifty feet east of him." If this evidence was true, and it was competent, and its credibility was for the jury, then the engine could have been readily stopped in time, if it could be stopped in forty· or forty-five feet, which the engineer testifies could be done, and was done on that occasion after striking and running over the deceased. Again, the witness states he did not see the engineer or fireman until after the collision, and adds, "And then I only saw the engineer sitting on his seat as the engine passed, so he did not seem to even know it that he had struck anything. He did not notice it. I was hallooing and pointing down to the man, and people on the Wabash were pointing at the man, and, as he passed over, something directed his attention. I do not know whether it was myself or some others. The engineer's head was not out of the cab window. They were going ten miles an hour, or about that rate of speed." Again he says: "The engine did not slow up a particle before it struck Hilz. The engineer was still working steam when he passed us."

The natural and plain import of the testimony of this witness, if believed, is that the engineer was not keeping any lookout, and that, if he had been, he would

have seen deceased time enough to avoid injuring him. This evidence is corroborated, we think, by some parts of the evidence given by the witnesses, Bowen, Ziegler and Fuchs, heretofore mentioned, whilst some parts of their testimony, as well as the testimony of other witnesses in the cause, may be, and, we think, are, just to the contrary. The evidence on both sides is perhaps somewhat inharmonious, and is manifestly conflicting as to these features of the case. The theory of the evidence for defendant, as shown at the trial, so far as this branch of the case is concerned, was that the engine was running at a lawful rate of speed and the deceased stepped onto the railroad track when the engine was distant from him only some twenty-five or thirty feet, and for that reason could not be seen by the engineer, whose view at that distance would be obstructed by the tender or "backboard," and that, even if seen, the engineer, with the prompt use of all the appliances at his command, could not in so short a space have prevented the injury.

If true, this was a good and sufficient defense, but the plaintiff's theory was that the engine was traveling at an unlawful rate of speed, and that the distance between the deceased and the engine was one hundred feet or more, and that the engine could have been stopped in less space than then intervened; that there was nothing to obstruct the view or to prevent the engineer seeing the dangerous situation and imminent peril of deceased, if he had been in proper position and properly attentive, and that the exercise of such reasonable care as the law required in view of the circumstances and surroundings would have enabled the servants in control of the engine to have seen the danger in time, and to have avoided running over the deceased. If this was so, then the negligence of the deceased in being upon the track, however censurable, was not, in legal contemplation, the proximate cause of the injury.

This was, as clearly appears, evidence *pro* and *con.*, and in support of both of these views. The whole subject in both aspects was involved and embraced in the inquiry submitted to the jury in said instruction given by the court of its own motion. Without prolonging the discussion further we think that the objection that the finding is without evidence is untenable, and we so rule and hold.

This leads to an affirmance of the judgment of the trial court, and it is accordingly so ordered, in which Judges BLACK and BARCLAY concur; Judges SHERWOOD and BRACE concur in the result.